## WILLIAMS v. THE STATE.

No. 7782. JULY 26, 1930.

*Joseph Law* and *G. C. Anderson,* for plaintiff in error.

*George Hains, solicitor-general,* and *John M. Graham,* contra.

HILL, J. Anthony Williams was indicted for the murder of Jim Scott by shooting him in the body with a shotgun. The jury returned a verdict of guilty, without a recommendation, and he was sentenced by the court to be electrocuted. A motion for new trial was overruled, and he excepted.

■ There was no eye-witness to the shooting. The evidence for the State tended to show that the deceased and his wife, Lou Scott, were shot to death in a field by the accused, who was an overseer or "overlooker" on the farm of Jesse P. Green; that for sometime before the homicide there had been ill feeling between the accused and the deceased, and on account of this ill feeling Mr. Green had discharged the deceased and his wife and told them to leave the farm; that threats were made by both the accused and the deceased, and these threats on the part of the deceased to kill the accused were communicated to him. The threat of the deceased was that "he would kill Anthony Williams if Anthony fooled with him." For some time before the homicide the defendant carried a shotgun with him to the field, as he did on the day of the killing. The defendant's statement as to what happened at the time of the homicide was, in part, as follows: "I was going right in this direction [indicating], and when I got to the end there to step up in the road, I reckon Lou and Jim Scott was sitting down in the bottom by some Johnson cane. Time I stepped in the road they come getting up and come on up the road towards me. I said, 'There now.' Spoke just that way. I didn't know what to do. They was walking in the road. My mind said go right on across the field. Well, gentlemen, I went right on across the field, and they come just as you would want to scare somebody, tipping up behind me up the big road, and when they got where I turned off into

the cotton-patch, they come right on behind me and run up to me about 40 yards and then I guess stepped up pretty good, coming up running; guess I was scared of Jim, and he hollered, 'Oh Anthony, hold up there, wait there.' I said, 'No, Jim, you go on ahead down there in the field and see the hands. You are coming now for a fuss, and I don't want no fuss. Go on down there in the field, because your wife has done told you, and you ain't going to believe nothing I say. You are coming for a fuss.' I never exactly stopped, but they kept coming right on. When I told them that, I seen they was trying to overtake me. Then I pulled up and went to running. Run for about three hundred yards or more from the big road where us turned in, and when he run up behind me this is his words: 'Gad damn you, I am going to kill you and drink your blood.' And his wife said: 'Catch him.' They were her words and his; and when they said that, gentlemen, I whirled around. Jim was as close to me when he spoke them words as that there place, that bannister, when he spoke that. Then I got scared and didn't see nothing else to do to help myself from them two people after me that way and I whirled around and shot twice immediately, and them two shots killed Jim Scott and his wife. Jim Scott's wife was raising her hand to reach for my gun. Gentlemen, that is true. Gentlemen I done that because they had done scared me. I had shunned them all the year. I was scared, and that is why I done it."

According to the testimony for the State, the tracks did not bear out the defendant's statement that the deceased and his wife were running after him at the time of the homicide. The tracks "were headed towards their home" (the home of the deceased and his wife), and they were going directly towards it. The evidence also failed to show that Scott and his wife had any weapon on or about them at the time of the homicide. The evidence for the State tended to show that the deceased died from the effect of gunshot wounds, he having been shot just below the collar-bone on the right side, there being a small hole with a few shots scattered around, indicating that the shots were fired at close range. Jim Scott was shot in the right side near the heart. The wound indicated that he was not shot at as close range as his wife. J. D. Minor, a witness for the State, testified that on the next morning after the homicide he went back to the field where the homicide occurred, and

followed the tracks of Anthony Williams where he told witness he went, and followed them to the scene of the shooting, where it appeared that he had remained for sometime on his knees. The witness also found there the imprint of a gun where it had been resting on the ground. This witness also followed the tracks of Jim Scott and Lou Scott from their bodies across the field whence they came. Part of the way the woman's tracks were in the tracks of the man, at other times they were alongside each other. They did not appear to be running. To come across the field from where they left the road was in direct line to their house. This witness arrested Anthony Williams about 9 o'clock at night, the killing having occurred about 2 o'clock p. m. At the time of the arrest Williams was at home. "Anthony Williams told me and Mack Tomlin that Jim and Lou Scott waylaid him." The deceased, in addition to being shot in the body, was shot on the back of his hand with six shots. Ola Williams testified that she went to the house of Anthony Williams after the homicide, and he was standing on his front porch, and she asked, "Anthony, did you kill Jim and Lou?" He said "Yes, Ola, I did. They aint got to die; they is done dead." I said, "About how far were you from them when you shot them?" He said, "Just about five feet." I said, "I am sorry." And I told him I had advised him a few days before that if he did such a thing he would be here in trouble away from his children, and Jim and Lou away from theirs. I said also, "I asked you not to do that when you said you were going to do so." He made no answer to this. From the evidence in the record the jury were authorized to find the accused guilty, and that he was not justified in taking the life of the deceased.

■ The motion for new trial complains that the court erred in charging the jury: "The reasonable doubt contemplated by the law, gentlemen, is not a mere vague, fancied, or imaginary doubt which a jury traveling out of the evidence may conjure up for itself, but a doubt which springs from the evidence or want of evidence and causes your minds to pause and hesitate as to the guilt of the accused. If you have such a doubt, it is your duty to acquit him. If you have no such doubt, it is equally your duty to convict him." The criticism of this charge is that nowhere in the charge as given did the court instruct the jury that "a reasonable doubt may arise from the defendant's statement" and would be suffi-

cient to acquit him, that the charge withdrew from the consideration of the jury the doubt that may arise from the defendant's statement, and that the failure to so charge was prejudicial error. The court instructed the jury with reference to the defendant's statement, in another portion of the charge; and it has been held that it is not required to couple with each reference to the evidence a reference to the prisoner's statement also. *Vaughn* v. *State,* 88 *Ga.* 731 (4), 738 (16 S. E. 64); *Simpson* v. *State,* 93 *Ga.* 197 (18 S. E. 526); *Jordan* v. *State,* 130 *Ga.* 406 (2) (60 S. E. 1063); *Walker* v. *State,* 118 *Ga.* 34 (44 S. E. 850). And see 2 Stevens' Index-Digest, 1083; 4 Cum. Supp. Enc. Dig. 448-451.

■ Another ground complains that the court charged the jury: "The prisoner has a right to make to the court and jury such statement as he deems proper in his own defense. It is not under oath, and you may believe it in preference to the sworn testimony in the case. It is your duty to give just such weight and credit as you believe it is entitled to, no more and no less." Movant contends that the use of language "no more and no less" was error, as it contained an expression of doubt on the part of the court as to there being any truth in the defendant's statement, and such language had a tendency to disparage the statement of the accused, and that the tone of the voice in which it was said, after the law had been correctly charged, undoubtedly minimized the importance of the statement of the accused, and was therefore prejudicial error. While it is generally better to instruct the jury in the language of the code, we do not think that the added words, "no more and no less," were of such importance as to require the grant of a new trial; and it has been held that the tone of voice of the trial judge in instructing the jury is not reviewable. *Anderson* v. *Tribble,* 66 *Ga.* 584, 588.

■ A third ground complains of a portion of the following charge of the court: "I charge you, gentlemen of the jury, that evidence has been introduced tending to show good character. I charge you that good character is a substantive fact, and like any other fact going to you for the consideration of the jury in the case; and if it of itself, or in connection with the other evidence, should create a reasonable doubt in your mind as to his guilt, it is your duty to give him the benefit of that doubt and acquit him. But I charge you, gentlemen of the jury, however good his previous

character may have been, if you believe beyond a reasonable doubt that he is guilty in this case, or those cases, then it is your duty to find him so, regardless of his previous good character." Movant contends that the words, "however good his previous character may have been," contain an unguarded expression of opinion and doubt by the court of whether the defendant's character would avail him anything in this trial, and especially so when followed by the language, "if you believe beyond a reasonable doubt that he is guilty . . then it is your duty to find him so;" and that such language withdrew from the jury the fact that previous good character might generate a sufficient doubt in the minds of the jury to acquit him. The language is not such as to require the grant of a new trial. *Brazil* v. *State,* 117 *Ga.* 32, 37 (43 S. E. 460) ; *Henderson* v. *State,* 120 *Ga.* 504 (48 S. E. 167) ; *Nelms* v. *State,* 123 *Ga.* 575 (51 S. E. 588).

*Judgment affirmed. All the Justices concur, except Russell, C. J., and Atkinson, J., who dissent.*